ams

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| BRET STOUDER, | ) |
| | ) |
|     Plaintiff, | ) |
| | ) |
| v. | )     Case No. 09-4113-JAR-KGS |
| | ) |
| M&A TECHNOLOGY, INC. and | ) |
| MAGDY ELWANY, | ) |
| | ) |
|     Defendants. | ) |
| | ) |

## MEMORANDUM AND ORDER DENYING MOTION FOR TEMPORARY RESTRAINING ORDER

Before the Court is defendant and counterclaimant M&A Technology ("M&A")'s Motion for Temporary Restraining Order (Doc. 28). M&A seeks a restraining order temporarily restraining, enjoining and prohibiting plaintiff Bret Stouder ("Stouder") from directly or indirectly providing services or advice or having an interest in any entity offering services or products similar to those offered by M&A, or from calling upon, soliciting, writing, directing, diverting or accepting business from any client of M&A. The Court conducted a hearing on this motion on November 2, 2009, during which the Court heard from both parties and heard evidence. As described more fully below, the Court denies M&A's Motion for Temporary Restraining Order ("TRO").

**I.    Procedural History**

Stouder filed this action on August 7, 2009, alleging claims against defendants for breach of an employment contract, and for wage claims under the Fair Labor Standards Act and Kansas Wage Claims Act. Before either defendant filed an Answer, Stouder filed a motion for partial

summary judgment on September 3, asking that the Court make an expeditious ruling on his motion to deem the restrictive covenants in the Employment Agreement unenforceable. He attached his own affidavit and various other exhibits in support of summary judgment  On September 9, M&A filed its Answer and Counterclaim for breach of contract, seeking declaratory relief and attorneys' fees. The defendants also filed a Motion to Dismiss on September 9, pursuant to Fed. R. Civ. P. 12(b)(6). The Court denied this motion without prejudice on October 27, 2009 and allowed Stouder until November 16, 2009 to amend his complaint.

On September 15, defendant M&A filed a motion for expedited discovery, asking that it be allowed to depose Stouder about the topics specified in his affidavit attached to the summary judgment motion and discussed in the motion itself. Noting that "some courts have denied summary judgment motions without prejudice when they are filed before discovery has occurred or when only minimal discovery has occurred,"[1] Judge Sebelius found good cause for the expedited discovery and granted M&A leave to take Stouder's deposition on six enumerated subjects that pertain to his motion for partial summary judgment.

Stouder was deposed on October 5, 2009 and defendants filed their response and cross-motion for partial summary judgment on October 13, 2009.[2] They filed the instant motion for TRO on October 19, 2009 based on information learned at Stouder's deposition.

## II.    Legal Standard

---

[1] (Doc. 18 at 4.)

[2] The response to M&A's cross-motion is due twenty-three days from October 13, 2009, or on November 5. The cross-motions would not be considered under advisement until the reply is filed; it is due not later than twenty-three days from service of the response. *See* D. Kan. R. 6.1(d)(2).

2

A TRO preserves the status quo and prevents immediate and irreparable harm until the court has an opportunity to pass upon the merits of a demand for preliminary injunction.[3] Where the parties have notice of and an opportunity to respond to a motion for TRO, the specific requirements of Rule 65(b) do not apply, including the ten-day limitation on the duration of the order.[4] Under these circumstances, the Court follows the same procedure as for a preliminary injunction.[5]

"As a preliminary injunction is an extraordinary remedy, the right to relief must be clear and unequivocal."[6] The moving party must establish the following elements to obtain relief: (1) a substantial likelihood of success on the merits; (2) a showing of irreparable injury unless the injunction issues; (3) proof that the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) a showing that the injunction, if issued, would not be adverse to the public interest.[7] In cases where the movant has prevailed on the other factors, the Tenth Circuit uses a liberal standard for "probability of success on the merits," so the moving party need only raise "questions going to the merits so serious, substantial, difficult and doubtful as to make them a fair ground for litigation and thus for more deliberate investigation."[8]

---

[3] *Flying Cross Check, L.L.C. v. Cent. Hockey League, Inc.,* 153 F. Supp. 2d 1253, 1258 (D. Kan. 2001).

[4] *See* Fed. R. Civ. P. 65(b); *Kan. Hosp. Ass'n v. Whiteman*, 835 F. Supp. 1548, 1551 (D. Kan. 1993).

[5] *Whiteman*, 835 F. Supp. at 1551.

[6] *Schrier v. Univ. of Col.*, 427 F.3d 1253, 1258 (10th Cir. 2005) (quoting *SCFC ILC, Inc. v. Visa USA, Inc.*, 936 F.2d 1096, 1098 (10th Cir. 1991)).

[7] *E.g.*, *id.*

[8] *Lundgrin v. Claytor*, 619 F.2d 61, 63 (10th Cir.1980) (internal quotations omitted).

There are three types of injunctions that are disfavored in the Tenth Circuit, and thus, must satisfy a heightened burden. Those injunctions are: (1) preliminary injunctions that alter the status quo; (2) mandatory preliminary injunctions; and (3) preliminary injunctions that afford the movant all the relief that it could recover at the conclusion of a full trial on the merits.[9] If an injunction falls into one of these categories, it "must be more closely scrutinized to assure that the exigencies of the case support the granting of a remedy that is extraordinary even in the normal course. Furthermore . . . movants seeking such an injunction are not entitled to rely on this Circuit's modified-likelihood-of-success-on-the-merits standard."[10] Neither party argues that a heightened standard applies here.

### III. Evidence

At the evidentiary hearing, M&A submitted the exhibits already filed in support of their motion, as well as one additional e-mail exhibit.[11] Stouder testified on behalf of himself and submitted a number of exhibits in opposition to the TRO. Stouder also orally moved for judgment on the contractual issue presented in his motion for partial summary judgment.

The Employment Agreement between Stouder and M&A became effective March 23, 2005. It states that Stouder's duties would focus on "developing and servicing local, regional and national customers for [M&A]," and that he would "oversee and direct the high performance computing staff and Linux activity of [M&A] and serve as its Vice President/General Manager of Open Source and High Performance Computing division known as TeamHPC."

---

[9]*O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973, 389 F.3d 973, 975 (10th Cir. 2004) (per curiam), *aff'd*, 546 U.S. 418 (2006); *see also Schrier*, 427 F.3d at 1258–59.

[10]*O Centro*, 389 F.3d at 975–76.

[11]The Court sustained Stouder's hearsay objection to Exhibit 1003, the affidavit of Donna Shepard, so it was not admitted.

The term of the agreement was for three years and it provided that it would renew automatically unless one party delivers written notice of intent to terminate within thirty days of expiration; neither party delivered this written notice and so the term renewed automatically in 2008.

Paragraph 6 of the Employment Agreement states:

> Prior to the expiration of the Term, the Employee shall have the right to terminate this Agreement only upon the occurrence of a default by the Corporation which is not cured within thirty (30) days following the delivery by the Employee to the Corporation of notice specifying such default. A default by the Corporation means the breach of the performance covenant described in Section 13 or Corporation's material failure to perform or comply with the [sic] any other of the Corporation's duties and obligations hereunder. Notice shall be as specified further in this agreement.

The Agreement provides that Stouder will receive an additional commission as consideration for his consent to the non-compete covenant provided for in Paragraph 11. The non-compete covenant in paragraph 11 applies for a period of two years after expiration of the Term. It states that this two-year period "shall be applicable regardless of the reason, if any, for termination of the Term. In the event of an uncured default by the Corporation, this Article shall be void."

In a letter dated June 18, 2009 to Magdy Elwany, M&A's President and CEO, Stouder wrote to "inform you of a material breach of the Employment agreement that was executed on March 23, 2005." He listed eight ways in which he believed M&A defaulted on the Agreement, including the failure to accept a purchase order and to notify Stouder "or reseller in a timely manner based on the conditions of the Purchase Order." He also alleged that M&A failed to provide divisional accounting so that he could determine profits, revenues, and expenses for the Team HPC division and that M&A failed to provide a succession plan for Elwany, pursuant to paragraph 16 of the Agreement.

In a letter dated July 17, 2009 to M&A, Stouder claimed that M&A was responsible for curing the defaults noted in his previous letter no later than thirty days following the delivery of notice by Stouder to M&A.

According to the Answer and Counterclaim, Stouder was terminated for multiple violations of paragraph 7 of the Employment Agreement, which provides for termination with cause. M&A alleges that Stouder was terminated for having questionable discussions with potential customers, ongoing refusal to cooperate with M&A, threats of physical violence against supervisors and other employees of M&A, and actions at a technology trade conference which resulted in a lawsuit against Stouder and M&A. In its cross-motion for summary judgment, M&A asserts that it gave Stouder formal notice of his termination on July 1, 2009 and tendered a Draft Separation Agreement to Stouder's attorney.

M&A submitted the transcript from Stouder's deposition on October 5, 2009.[12] Stouder admitted during the deposition that (1) he has had several discussions about M&A's business with current and potential M&A customers[13]; (2) he admits to having spoken in-depth with potential employers who are competitors of M&A about employment[14]; and (3) he admits that he

---

[12](Ex. 1002.)

[13]Stouder was asked about his discussions with the National Energy Technology Laboratory ("NETL"), a customer of M&A, and orders that could go to companies other than M&A. He stated, "if there were going to be ongoing public bid opportunities that came available I wanted them to, to understand that I was no longer a part of M&A Technology and that it was my hopes that the judge would go ahead and rule based upon the ongoing breaches of Magdy Elwany and M&A that my noncompete is null and void." (Ex. 1002 at 36:11–25 to 37:1.)

[14]When asked, "Do you have another job substantially lined up awaiting the details of your employment agreement," Stouder responded, "Possibly, yes." (Ex. 1002 at 39:16–19.)

has directed orders away from M&A and to companies that he is negotiating with for future employment.[15]

The evidence presented by Stouder at the hearing primarily focused on his alleged breach of contract claim—that M&A defaulted on the Employment Agreement and failed to cure their defaults, rendering the restrictive covenants void. Stouder testified about his Employment Agreement and the various ways in which he alleges M&A defaulted on certain provisions in that agreement.

Stouder also testified at the hearing that none of M&A's competitors are willing to employ him until the Court resolves whether he is bound by the restrictive covenants. Stouder testified about M&A's business and customers—he stated that he sold high performance computer clusters for M&A through a subsidiary called Team HPC. Stouder testified that M&A had not sold these products prior to him joining the company. The customer base for these products are research facilities and universities that purchase the products through an open bid process. Stouder testified that, as a salesman of these products, he could not carry the customers with him elsewhere and that he was not the only point of contact for all of the products sold through Team HPC.

Elwany states in his affidavit, submitted with M&A's cross-motion for summary judgment,[16] that he informed Stouder that his employment was being terminated on June 13, 2009 and summoned him for a face-to-face meeting on Monday, June 15. Elwany states that during the June 15 meeting, Stouder refused to answer direct questions Elwany had about a

---

[15]"I have asked potential customers to, yes, to wait until we find out what the judge rules." (Ex. 1002 at 40:12–14.)

[16](Doc. 26, Ex. 13.)

purchase order on a project, that the conversation became heated, and that he again told Stouder that his employment with M&A was over. Stouder testified at the hearing about the meeting he had with Elwany on June 15 and submitted a recording of that conversation that Stouder surreptitiously recorded.[17] Stouder denies that the conversation was ever heated and that Elwany terminated him, either on June 13 or at the June 15 meeting. He also testified that during the June 15 meeting, Elwany expressed his desire to sell Team HPC and asked Stouder to purchase it, or to find a company that would be willing to purchase it.

Stouder testified that he was first denied physical access to the M&A office on July 22, 2009 and that he was denied electronic access on July 21. Stouder testified that he enjoyed full access to company resources prior to July 21 and submitted testimony and evidence that he was contacted by an employee in the Human Resources department each day through July 16, 2009 to obtain an attendance report for Stouder's employees.

## IV. Discussion

### A. *Likelihood of Success on the Merits*

The elements for a breach of contract claim under Kansas law are: (1) the existence of a contract between the parties; (2) consideration; (3) the plaintiff's performance or willingness to perform in compliance with the contract; (4) defendant's breach of the contract; and (5) that plaintiff suffered damage caused by the breach.[18] The elements at issue are whether a contract existed between the parties at the time of the alleged breach, whether either party performed in compliance with the contract, and whether either party breached the contract.

---

[17](Ex. 16.) The Court also admitted Exhibit 14, which is a transcript of this recording that appears to have been prepared by Stouder. It is not certified; however, the parties stipulated to its admission for the limited purpose of the TRO hearing.

[18]*See, e.g.*, *Britvic Soft Drinks, Ltd. v. ACSIS Techs., Inc.*, 265 F. Supp. 2d 1179, 1187 (D. Kan. 2003).

M&A first contends that the non-compete agreement is reasonable. Kansas law provides that:

> A noncompetition covenant ancillary to an employment contract is valid and enforceable if the restraint is reasonable under the circumstances and not adverse to the public welfare. The rationale for enforcing a noncompetition covenant is based on the freedom of contract. However, it is well settled that only a legitimate business interest may be protected by a noncompetition covenant. If the sole purpose is to avoid ordinary competition, it is unreasonable and unenforceable. Additionally, noncompetition covenants included in employment contracts are strictly construed against the employer.[19]

The factors to determine whether a non-compete clause is reasonable are:

> (1) Does the covenant protect a legitimate business interest of the employer? (2) Does the covenant create an undue burden on the employee? (3) Is the covenant injurious to the public welfare? (4) Are the time and territorial limitations contained in the covenant reasonable? The determination of reasonableness is made on the particular facts and circumstances of each case.[20]

Stouder does not object to the reasonableness of the non-compete clause in paragraph 11 of the Employment Agreement. Instead, Stouder contends that the restrictive covenants in paragraph 11 are void because M&A was in default and failed to cure those defaults within thirty days of receiving written notice. Defendants argue on summary judgment that (1) paragraph 6 only provides grounds for Stouder to terminate the Agreement; he did not terminate the Agreement, instead, M&A terminated the Agreement when it terminated Stouder's employment for cause under paragraph 7; (2) termination does not remove the restrictive covenants under the

---

[19] *Idbeis v. Wichita Surgical Specialists, P.A.*, 112 P.3d 81, 86–87 (Kan. 2005) (quoting *Weber v. Tillman*, 913 P.2d 84, 89 (1996) (internal quotations omitted)).

[20] *Id.* at 87 (quoting *Weber*, 913 P.2d at 90).

plain language of paragraph 11 and they remain effective; (3) none of the exhibits submitted by Stouder in support of summary judgment are properly authenticated; (4) none of the alleged defaults were uncured because the thirty day time period allowed to cure the default did not expire before M&A terminated Stouder for cause; and (5) there were no defaults.

Contrary to Stouder's contention at the hearing, resolution of the contract issues in this case does not merely involve questions of contract interpretation. It also requires a discussion of several issues of fact such as (1) when Stouder was terminated; (2) which party terminated the contract first; (3) whether Stouder was terminated for cause; (4) whether M&A defaulted under the terms of the contract, and (5) if M&A defaulted, whether there was an opportunity to cure. While the Court can easily find "questions going to the merits so serious, substantial, difficult and doubtful as to make them a fair ground for litigation and thus for more deliberate investigation,"[21] it is unable at this time to determine that either party can establish substantial likelihood of success on the merits. These issues will be addressed on cross-motions for summary judgment.

### B. *Irreparable Harm and Balance of Harms*

Irreparable harm may be shown to exist where money damages are inadequate to compensate the wrong or where there are difficulties in the calculation of losses.[22] "'Loss of customers, loss of goodwill, and threats to a business' viability can constitute irreparable harm.'"[23] Purely speculative harm does not amount to irreparable harm.[24] The "irreparable harm

---

[21]*Lundgrin v. Claytor*, 619 F.2d 61, 63 (10th Cir. 1980) (internal quotations omitted).

[22]*Flying Cross Check, L.L.C. v. Cent. Hockey League, Inc.,* 153 F. Supp. 2d 1253, 1259 (D. Kan. 2001).

[23]*Id.* (quoting *Zurn Constructors, Inc. v. B.F. Goodrich Co.*, 685 F. Supp. 1172, 1181 (D. Kan. 1988)).

[24]*Greater Yellowstone Coal. v. Flowers*, 321 F.3d 1250, 1259 (10th Cir. 2003).

requirement is met if a plaintiff demonstrates a significant risk that he or she will experience harm that cannot be compensated after the fact by monetary damages."[25]

M&A has submitted the deposition testimony of Stouder where he admits to discussing potential employment with M&A's competitors, discussing the bid process with M&A's customers, and encouraging those customers to work with competitors. It argues that it will suffer irreparable harm from Stouder using its confidential and proprietary information, its loss of customers, good will, brand recognition, and referral sources. But Stouder testified in his deposition that M&A intends to sell Team HPC and withdraw from the high performance computing market. Stouder also testified that the customer base for these products is research facilities and universities that purchase the products through an open bid process. Stouder testified that, as a salesman of these products, he could not carry the customers with him elsewhere and that he was not the only point of contact for all of the products sold through Team HPC. Stouder testified about a meeting with Elwany on June 15 when Elwany offered to sell Team HPC to Stouder and expressed his desire for Stouder to locate a buyer for Team HPC. Stouder submitted a tape recording from this meeting that substantiates his testimony.

M&A did not submit evidence to controvert Stouder's testimony that M&A seeks to withdraw from the high performance computing market. Given this evidence, the Court is unable to find that M&A would suffer irreparable injury because it does not intend to continue to compete in the high performance computing market. Stouder testified that M&A did not participate in this market until he was hired to oversee Team HPC. And the tape recording of Stouder's meeting with Elwany supports the contention that Elwany no longer desired to

---

[25]*Id.* (quotation omitted).

participate in this market and either wanted Stouder to buy out Team HPC, or to find another buyer. During the meeting, Stouder and Elwany discussed at length whether M&A should allow Stouder out of his Employment Agreement so that he could work elsewhere, or whether they could work things out for him so that he could stay with M&A. The Court is unable to find that Stouder's discussions with customers and competitors constitutes irreparable harm because there is no evidence that these parties are presently customers and/or competitors of M&A.

Stouder argues that he will suffer harm based on his inability to become employed given the restrictive covenants in his Employment Agreement. But defendants are correct that Stouder was paid a premium so that he would agree to the restrictive covenants in his employment contract. The Court does not weigh heavily the harm to Stouder caused by abiding by the restrictive covenants, to the extent they are enforceable. While the harm to M&A does not rise to the level of irreparable harm, it still outweighs any harm that would be suffered by Stouder if an injunction was to be granted.

### C. *Public Interest*

M&A contends that the public interest is served by requiring Stouder to honor his contractual obligations under Kansas law. Indeed, "the enforcement of valid contracts is in the public interest. Moreover, the public has an interest in restraining unfair competitive practices."[26] The Court finds that the public interest is served by requiring Stouder to honor his contract with M&A.

---

[26] *Heatron, Inc. v. Shackelford*, 898 F. Supp. 1491, 1502 (D. Kan. 1995).

### D. *Conclusion*

The Court is unable to find irreparable harm based on the evidence presented at the November 2, 2009 hearing. As such, the modified likelihood of success on the merits standard does not apply and M&A was required to show a substantial likelihood of success on the merits. Because M&A is unable to make this showing due to a multitude of questions of fact that are before the Court on cross motions for summary judgment, the Court is unable to find that a preliminary injunctive relief is warranted.

The Court notes that its ruling on this motion should in no way operate as an endorsement of Stouder's admitted-to activities since his termination. If Stouder continues to contact M&A's customers and competitors, he must assume the risk that the Court may ultimately find in favor of M&A on summary judgment, or alternatively, that a jury ultimately finds in favor of M&A on its breach of contract counterclaim.

**IT IS THEREFORE ORDERED BY THE COURT** that defendant and counterclaimant M&A Technology ("M&A")'s Motion for Temporary Restraining Order (Doc. 28) is denied.

**IT IS SO ORDERED.**

Dated: <u>November 5, 2009</u>

S/ Julie A. Robinson<br>JULIE A. ROBINSON<br>UNITED STATES DISTRICT JUDGE