# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| **BRET STOUDER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 09-4113-JAR-KGS** |
| | ) | |
| **M&A TECHNOLOGY, INC. and** | ) | |
| **MAGDY ELWANY,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

## MEMORANDUM AND ORDER

Before the Court are plaintiff Bret Stouder's Motion for Partial Summary Judgment for Declaratory Relief (Doc. 8) and defendants Magdy Elwany and M&A Technology's ("M&A") Cross-Motion for Summary Judgment (Doc. 25). While these motions were pending and after the Court denied defendant M&A's Motion for Temporary Restraining Order ("TRO"), defendants filed a Motion for Preliminary Injunction (Doc. 38), arguing that new facts had developed since the Court's TRO ruling that warranted a preliminary injunction. The Court conducted a hearing on this motion on February 24, 2010 that was continued to April 5, 2010. The Court has considered the summary judgment briefs and is prepared to grant defendants' motion for summary judgment and deny plaintiff's motion. The Court further finds in favor of defendants on their motion for preliminary injunction.

## I.      Procedural History

Stouder filed this action on August 7, 2009, alleging claims against defendants for breach of an employment contract, and for wage claims under the Fair Labor Standards Act and Kansas

Wage Claims Act. Before either defendant filed an Answer, Stouder filed a motion for partial summary judgment on September 3, asking that the Court make an expeditious ruling on his motion to deem the restrictive covenants in the Employment Agreement unenforceable. He attached his own affidavit and various other exhibits in support of summary judgment. On September 9, M&A filed its Answer and Counterclaim for breach of contract, seeking declaratory relief and attorneys' fees. Defendants also filed a Motion to Dismiss on September 9, pursuant to Fed. R. Civ. P. 12(b)(6). The Court denied this motion without prejudice on October 27, 2009 and allowed Stouder until November 16, 2009 to amend his complaint with respect to any Fair Labor Standards Act claim that he intended to raise in the Complaint. Plaintiff has not filed an amended complaint to date; therefore, the only remaining claims in this action by plaintiff are for breach of the employment agreement, including breach of the duty of good faith and fair dealing, and a claim under the Kansas Wage Payment Act.

On September 15, defendant M&A filed a motion for expedited discovery, asking that it be allowed to depose Stouder about the topics specified in his affidavit attached to the summary judgment motion and discussed in the motion itself. Noting that "some courts have denied summary judgment motions without prejudice when they are filed before discovery has occurred or when only minimal discovery has occurred,"[1] Judge Sebelius found good cause for the expedited discovery and granted M&A leave to take Stouder's deposition on six enumerated subjects that pertain to his motion for partial summary judgment. Stouder was deposed on October 5, 2009 and defendants filed their response and cross-motion for partial summary judgment on October 13, 2009.

_____

[1](Doc. 18 at 4.)

The Court conducted a hearing on the motion for TRO on November 2, 2009. In its motion for TRO, defendants requested a restraining order temporarily restraining, enjoining and prohibiting plaintiff from directly or indirectly providing services or advice or having an interest in any entity offering services or products similar to those offered by M&A, or from calling upon, soliciting, writing, directing, diverting or accepting business from any client of M&A. The Court denied the motion for TRO because it was unable to find irreparable harm based on the evidence presented at hearing. As such, it found that the modified likelihood of success on the merits standard does not apply and M&A was required to show a substantial likelihood of success on the merits. Because M&A was unable to make this showing due to a multitude of questions of fact that are before the Court on cross motions for summary judgment, the Court denied preliminary injunctive relief.

Defendants filed a "Motion to Set a Preliminary Injunction Hearing Date" on January 22, 2010, attaching the Affidavit of Donna Shepard, who attests to certain facts that call into question the Court's previous finding that M&A was unable to show irreparable harm.[2] Because defendants' motion renews a motion that has already been heard and decided, the Court ordered that it would entertain another hearing only to the extent defendants had new evidence to submit on the issue of irreparable harm that had developed since the time of the last hearing on November 2, 2009. At the hearing on February 24, 2010, both sides of this dispute essentially asked the Court to reconsider its TRO Order: defendants sought reconsideration of the Court's finding that they failed to prove irreparable harm and plaintiff asked the Court to reconsider its finding that defendants raised a "probability" of success on the merits, despite its finding that

---

[2](Doc. 39, Ex. 1.)

defendants could not show "substantial likelihood of success on the merits."  Accordingly, despite the Court's directive, both sides fully litigated defendants' motion for preliminary injunction at the hearing, necessitating a continuance of the hearing.  Interestingly, neither side has supplemented their premature summary judgment motions with the evidence produced at the TRO and preliminary injunction hearings—a natural consequence of seeking summary judgment prior to discovery.  Therefore, the Court proceeds to consider the summary judgment motions without regard for that evidence.

## II.    Summary Judgment Standard

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."[3]  A fact is only material under this standard if a dispute over it would affect the outcome of the suit.[4]  An issue is only genuine if it "is such that a reasonable jury could return a verdict for the nonmoving party."[5]  The inquiry essentially determines if there is a need for trial, or whether the evidence "is so one-sided that one party must prevail as a matter of law."[6]

The moving party bears the initial burden of providing the court with the basis for the motion and identifying those portions of the record that show the absence of a genuine issue of material fact.[7]  "A movant that will not bear the burden of persuasion at trial need not negate the

---

[3]Fed. R. Civ. P. 56(c).

[4]*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

[5]*Id.*

[6]*Id.* at 251–52.

[7]*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

4

nonmovant's claim."[8]  The burden may be met by showing that there is no evidence to support

the nonmoving party's case.[9]  If this initial burden is met, the nonmovant must then "go beyond

the pleadings and 'set forth specific facts' that would be admissible in evidence in the event of

trial from which a rational trier of fact could find for the nonmovant."[10]  When the moving party

also bears the burden of proof at trial,

> a more stringent summary judgment standard applies. Thus, if the
> moving party bears the burden of proof, to obtain summary
> judgment, it cannot force the nonmoving party to come forward
> with "specific facts showing there [is] a genuine issue for trial"
> merely by pointing to parts of the record that it believes illustrate
> the absence of a genuine issue of material fact. Instead, the moving
> party must establish, as a matter of law, all essential elements of
> the issue before the nonmoving party can be obligated to bring
> forward any specific facts alleged to rebut the movant's case.[11]

When examining the underlying facts of the case, the Court is cognizant that all

inferences must be viewed in the light most favorable to the nonmoving party and that it may not

make credibility determinations or weigh the evidence.[12]

## III.    Uncontroverted Facts

Plaintiff was employed by M&A according to the terms and conditions found in their

Employment Agreement ("Agreement") dated March 23, 2005.[13]  Stouder and his attorney,

---

[8]*Thom v. Bristol-Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2003) (citing *Celotex Corp.*, 477 U.S. at 325).

[9]*Id.*

[10]*Id.*

[11]*Pelt v. Utah*, 539 F.3d 1271, 1280 (10th Cir. 2008) (citations omitted).

[12]*See Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986).

[13](Doc. 9, Ex. A.)

Daniel Owen, initially drafted Stouder's Employment Agreement with M&A. Magdy Elwany, the CEO and President of M&A, negotiated the Agreement on behalf of M&A. Elwany and his attorney requested certain changes be made to the Agreement before it was signed by both parties.

Paragraph 1 of the Agreement provides for plaintiff's duties; he was to oversee and direct the high performance computing staff and Linux activity at M&A and "serve as its Vice President/General Manager of Open Source and High Performance Computing division known as TeamHPC." The term of the Agreement was three years, to renew automatically unless one party delivers written notice prior to the expiration date of his intention to terminate.

Paragraphs 6 and 7 of the Agreement provide for termination: paragraph 6 is entitled "Termination by Employee" and paragraph 7 is entitled "Termination by Corporation." Paragraph 6 provides:

> Prior to the expiration of the Term, the Employee shall have the right to terminate this Agreement only upon the occurrence of a default by the Corporation which is not cured within thirty (30) days following the delivery by the Employee to the Corporation of notice specifying such default. A default by the Corporation means the breach of the performance covenant described in Section 13 or Corporation's material failure to perform or comply with the any [sic] other of the Corporation's duties and obligations hereunder. Notice shall be as specified further in this agreement.

Paragraph 7 provides:

> Prior to the expiration of the Term, the Corporation shall have the right to terminate this Agreement only upon the occurrence of a default by the Employee. A default by the Employee means any one of the following:
> (a)      a material failure of the Employee to perform or comply with the Employee's duties and obligations hereunder or failure to comply with an order or direction from the

Corporation which is not cured within thirty (30) days following the delivery by the Corporation to the Employee of notice specifying such default;

(b)      the Employee commits an act of business misconduct which would permit Employee to be discharged for cause;

(c)      the Employee commits an act of dishonesty in connection with the Employee's employment hereunder;

(d)      the Employee's activities or conduct are disruptive to the operations of the Corporation, or threaten the security, safety, welfare, privacy or legitimate business interests of the customers of the Corporation;

(e)      the Employee violates the confidentiality or non-competition provisions of Section [sic] hereof; . . .

The Agreement provides in paragraph 8 that if M&A terminates the Agreement "without just cause," it must compensate plaintiff for a period of two years at an annual rate of $150,000.

Paragraph 11 of the Agreement contains a Covenant not to Compete and a nondisclosure agreement as follows:

(a)      Unless the Corporation otherwise consents in writing, during the Term (excepting services provided hereunder) and for a period of two (2) years after expiration of the Term the Employee shall not in any manner, directly or indirectly, provide business services or advice or have an interest in any entity offering services or products similar to those offered by the Corporation, whether as an officer, employee, agent, partner, consultant or otherwise; or call upon, solicit, write, direct, divert or accept business from any Client of the Corporation wherever located. The two-(2) year restricted period shall be applicable regardless of the reason, if any, for termination of the Term[.] In the event of an uncured default by the Corporation, this Article shall be void.

(b)      Employee shall not at any time, directly or indirectly, divulge, disclose or communicate to any person or entity any information affecting or relating to the business of the Corporation . . . and that any breach of this paragraph is a material breach of this Agreement. This shall not apply to matters which have become public knowledge by means other than improper disclosure by the Employee. In no

event shall the restricted period be less than two (2) years
from the Closing as defined in the Agreement and Plan of
Reorganization.  In the event of an uncured default by the
Corporation, this Article shall be void.

Under paragraph 10, plaintiff's salary was comprised of an annual base salary, a commission on

revenue generated directly by him, and "[a]n additional commission . . . for his consent to the

noncompete covenant provided in Section 11.  The additional commission will equal 5% of the

gross margin from sales of Mr. Foster, Mr. Allison, and other salespersons in the TeamHPC

division who report to [plaintiff] and are approved by [M&A]."

M&A had several obligations under the terms of the Agreement.  Under paragraph 13(a),

M&A "will accept all purchase orders procured by Employee or other sales personnel within the

TeamHPC division, provided that such purchase orders are commercially reasonable and would

be beneficial to a financially solvent company engaged in the same business as Employer."

Paragraph 13(b) provided further that M&A "will deliver al products ordered through the

TeamHPC division from Employer's manufacturing facility to the TeamHPC division within 45

days of the acceptance of the purchase order by [M&A]."  That provision also details how M&A

may extend the time for delivery for a reasonable period.

Under Paragraph 14, M&A is required to "keep books of account sufficient to enable

Employee to determine the revenues, profits, and expenses of the TeamHPC division of

Employer.  Employee shall have the right to inspect and copy all such books of account upon 10

days written notice."  Under paragraph 16, M&A agreed to create "a written legally enforceable

plan for succession of ownership and continued operation of M&A Technology, Inc. in the event

of death, disability, retirement or withdrawal from business of the principal stockholder Magdy

Elwany."  The Agreement requires the succession plan to be "fully completed and executed by

March 31, 2007 and . . . available for inspection and review by Employee."

M&A provided plaintiff with monthly and year-end accounting reports. Plaintiff also received a yearly profit and loss statement for TeamHPC. From November 4, 2004 through October 8, 2007, Elwany drafted a series of memoranda to the "Accounting Department" regarding "Signature authority" and "Signature authority during my absence." In each memorandum, he authorized certain individuals to sign certain types of checks and other documents and in some of the memoranda, he indicated a range of dates during which he anticipated being out of the office and provided signature authority for those date ranges only.

In May 2009, TeamHPC procured a purchase order from Wyle Laboratories for over $1 million in supercomputers (the "China Lake" purchase order). Upon receiving the China Lake purchase order, Donna Shepard, Senior Vice President of EDU Sales, Purchase and Operations of M&A, noticed that it was not made out to M&A; it was made out to Federal Edge. The Purchase Order indicated, "C/O M&A Technology," in a different font than the rest of the purchase order, which made Shepard concerned that the purchase order had been modified after it was issued by Wyle. M&A had serious concerns regarding the purchase order and Elwany raised these concerns with plaintiff. Among Elwany's questions was whether Federal Edge had executed an assignment of proceeds. Stouder responded to Elwany's questions by email. M&A was also concerned because the China Lake purchase order was a federal government order classified as D0C9, meaning that it is a high-priority order that would have to be manufactured before any other government contracts M&A had accepted. M&A, however, had already accepted another order classified D0C9.

On June 15, 2009, Elwany had a meeting with plaintiff in Dallas, Texas. Three days after

this meeting, on June 18, 2009, plaintiff wrote a letter to Elwany alleging that M&A had defaulted under the Employment Agreement. The letter alleged that M&A was in default "[a]s per item 6 of the agreement," on eight different grounds, including: (1) failing to accept the China Lake purchase order and notify plaintiff or the reseller in a timely manner based on the conditions of the purchase order; (2) failing to assist in the speedy delivery of TeamHPC systems; (3) failing to provide plaintiff with divisional accounting so that he could determine profits, revenues and expenses of the TeamHPC division; and (4) failing to provide plaintiff with a copy of the succession plan for Elwany. Plaintiff sent the letter on June 24, 2009 and it was received by M&A on June 26, 2009.

On July 9, 2009, Chris Kalis, M&A's Texas counsel, sent a Separation Agreement to Owen by email, stating that plaintiff was terminated on July 1, 2009, effective July 21, 2009. Owen responded that plaintiff was not aware that his employment had been terminated. In a letter dated July 17, 2009 to M&A, Stouder claimed that M&A was responsible for curing the defaults noted in his previous letter no later than thirty days following the delivery of notice by Stouder to M&A. M&A's counsel also sent plaintiff a letter on July 23, 2009, stating that plaintiff had been terminated for cause effective July 1, 2009. Plaintiff maintains that the parties were negotiating a mutual agreement through July 21, 2009 to terminate his Employment Agreement.

## IV. Discussion

Plaintiff moves for partial summary judgment on the issue of whether the employment restrictions—the noncompete and nondisclosure provisions in Paragraph 11(a)–(b)—are enforceable against him. He seeks a declaratory judgment that M&A breached paragraphs 16,

13(a), 13(b), and 14 of the Agreement and; therefore, the restrictions in Paragraph 11(a) and 11(b) are void. Defendants filed a cross-motion for summary judgment, arguing that (1) paragraph 6 only provides grounds for Stouder to terminate the Agreement; he did not terminate the Agreement, instead, M&A terminated the Agreement when it terminated Stouder's employment for cause under paragraph 7; (2) termination does not remove the restrictive covenants under the plain language of paragraph 11 and they remain effective; (3) none of the exhibits submitted by Stouder in support of summary judgment are properly authenticated[14]; (4) none of the alleged defaults were uncured because the thirty-day time period allowed to cure the default did not expire before M&A terminated Stouder for cause; and (5) M&A did not default. The parties have dueling interpretations of the Employment Agreement; particularly, how the provisions in paragraph 6 regarding termination by the Employee relate to the restrictive covenants in paragraph 11.

The elements for a breach of contract claim under Kansas law are: (1) the existence of a contract between the parties; (2) consideration; (3) the plaintiff's performance or willingness to perform in compliance with the contract; (4) defendant's breach of the contract; and (5) that plaintiff suffered damage caused by the breach.[15]

The construction of a written contract is a question of law, as is whether a contract is ambiguous.[16] Generally, if the language in a written contract "is clear and can be carried out as

---

[14]This argument is moot, as plaintiff submitted an affidavit in response to defendants' motion that properly authenticates the documents submitted in support of his motion (Doc. 34, Ex. 2).

[15]*See, e.g.*, *Britvic Soft Drinks, Ltd. v. ACSIS Techs., Inc.*, 265 F. Supp. 2d 1179, 1187 (D. Kan. 2003). The contract states that it is governed by Kansas law. (Doc. 29, Ex. 1 ¶ 19.)

[16]*See, e.g.*, *Ponds ex rel. Poole v. Hertz Corp.*, 158 P.3d 369, 372 (Kan. Ct. App. 2007).

written, there is no room for rules of construction. To be ambiguous, a contract must contain provisions or language of doubtful or conflicting meaning, as gleaned from a natural and reasonable interpretation of its language."[17] "'In considering a contract which is unambiguous and whose language is not doubtful or obscure, words used therein are to be given their plain, general and common meaning, and a contract of this character is to be enforced according to its terms.'"[18] The cardinal rule of contract interpretation is that the court must ascertain the parties' intention and give effect to that intention when legal principles so allow.[19] Where a contract is complete and unambiguous on its face, the court must determine the intent of the parties from the four corners of the document, without regard to extrinsic or parole evidence.[20]

Whether a contract is ambiguous is also a question of law for the court.[21] "Ambiguity in a written contract does not appear until the application of pertinent rules of interpretation to the face of the instrument leaves it generally uncertain which one of two or more meanings is the proper meaning."[22] "The court must not consider the disputed provision in isolation, but must instead construe the term in light of the contract as a whole, such that if construction of the

---

[17]*Gore v. Beren*, 867 P.2d 330, 336 (Kan. 1994) (quotation omitted). A contract is construed against the drafter if the meaning is ambiguous. *Liggat v. Employers Mut. Cas. Co.*, 46 P.3d 1120, 1126 (Kan. 2002). The Court declines to construe the agreement against plaintiff because it finds that the contract can be carried out as written; it is not ambiguous. Moreover, there is a genuine issue of material fact about whether Owen alone drafted the Agreement. According to Owen, defendants submitted numerous revisions to his initial draft that were incorporated into the final draft.

[18]*Wagnon v. Slawson Exploration Co.*, 874 P.2d 659, 666 (Kan. 1994) (quoting *Barnett v. Oliver*, 672 P.2d 1228, 1238 (Kan. Ct. App. 1993)) (internal quotation omitted).

[19]*Kay-Cee Enter., Inc. v. Amoco Oil Co.*, 45 F. Supp. 2d 840, 843 (D. Kan. 1999) (citing *Hollenbeck v. Household Bank*, 829 P.2d 903, 903–06 (Kan. 1992)).

[20]*Id.* (citing *Simon v. Nat'l Farmers Org., Inc.*, 829 P.2d 884, 887–88 (Kan. 1992)).

[21]*Simon*, 829 P.2d at 888.

[22]*Id.* (citing *Farm Bureau Mut. Ins. Co. v. Old Hickory Cas. Ins. Co.*, 810 P.2d 283, 284 (Kan. 1991)).

contract in its entirety removes any perceived ambiguity, no ambiguity exists."[23]  The Court is to use common sense and not strain to create an ambiguity in a written instrument when one does not exist.[24]  The fact that the parties do not agree over the meaning of terms does not in and of itself prove that the contract is ambiguous.[25]

### Interpretation of Paragraphs 6 and 11

Neither party argues that the Agreement is ambiguous; they simply disagree over the meaning of certain terms in the Agreement and over the relationship between paragraphs 6 and 11.  Paragraph 11(a) sets forth the Covenant not to Compete, concluding that it applies "regardless of the reason, if any, for termination of the Term[.]  In the event of an uncured default by the Corporation, this Article shall be void."  Paragraph 11(b) likewise concludes with the sentence, "In the event of an uncured default by the Corporation, this Article shall be void."

Essentially, the parties ask the Court to determine as a matter of law, the meaning of and reference to "uncured default by the Corporation" at the end of Paragraphs 11(a) and (b).  Plaintiff insists that the term "default," as used in paragraphs 11(a) and 11(b), is defined in Paragraph 6: "A default by the Corporation means the breach of the performance covenant described in Section 13 or Corporation's material failure to perform or comply with the any [sic] other of the Corporation's duties and obligations hereunder.  Notice shall be as specified further in this agreement."  Plaintiff maintains that defendant breached the Agreement in four different ways, that he provided notice as required in the Agreement, and M&A failed to cure those

---

[23]*Id.* (citing *Arnold v. S.J.L. of Kan. Corp.*, 749 P.2d 64 (1991)).

[24]*Eggleston v. State Farm Mut. Auto. Ins. Co.*, 906 P.2d 661, 662 (Kan. Ct. App. 1996).

[25]*Ryco Packaging Corp. v. Chapelle Int'l, Ltd.*, 926 P.2d 669, 674 (Kan. Ct. App. 1996).

defaults.

The Court has reviewed the contract in its entirety, as it is required to do under Kansas law, and applies common sense to its reading of the contract terms at issue. In so doing, the Court is unable to find that the contract is ambiguous. In addition to providing for the conditions upon which termination may occur by the Corporation and by the Employee, paragraphs 6 and 7 define "default by the Corporation" and "default by the Employee." Under paragraph 6, the Employee has the right to terminate the Agreement "only upon the occurrence of a default by the Corporation which is not cured within thirty (30) days following the delivery by the Employee the Corporation of notice . . . ." Likewise, the Corporation has the right to terminate the Agreement "only upon the occurrence of default by the Employee." Paragraph 7 defines six types of default by Employee.

The Court agrees with plaintiff that the definition of "default by the Corporation" in paragraph 6 applies equally in the context of paragraph 11. The Court further finds that the meaning of "uncured default by the Corporation" is provided for in paragraph 6. The fact that the definition appears under a section pertaining to "Termination by Employee" is of no moment. The Agreement expressly provides that "headings or captions of the sections or subsections hereof are inserted for convenience only and are not intended to define or limit the provisions or intent of this Agreement."[26] Therefore, the Court finds that paragraphs 11(a) and 11(b) are void if there is an "uncured" "default by the Corporation," as those terms are defined in paragraph 6.

"Uncured" is not expressly defined in the contract, however, the Court finds that a reasonable, prudent person would not be confused by the term after reading the entire

---

[26](Doc. 29, Ex. 1 ¶ 20.)

Agreement.  Paragraph 6 gives the Employee the right to terminate upon a default by the Corporation "which is not cured within thirty (30) days" of notice.  After defining the phrase "default by the Corporation," paragraph 6 states that "Notice shall be as specified further in this agreement."  The Court finds that, giving a plain, general and common meaning to the words used in the Agreement, the parties intended "uncured default by the Corporation" in paragraphs 11(a) and 11(b) to have the meaning set forth in paragraph 6.  That is, an uncured default is one that is not cured within thirty days of the delivery of notice.  Additionally, the Court finds that this was the interpretation intended by the parties.  If the parties intended "uncured default by the Corporation" to mean something different than the definition in paragraph 6, they could have provided for this.  Instead, they used the same terminology in both sections.  There is no other reference or discussion of "default" or "cure" in the Agreement.  The Court notes that plaintiff clearly understood that there was a thirty-day period to cure, as he indicated this in the Notices he sent on June 24, and July 17.

*Termination*

The next issue raised by the parties is whether plaintiff was required to terminate the Agreement pursuant to paragraph 6 in order for the restrictive covenants in Article 11 to become void.  Plaintiff contends that he was not required to actually terminate the Agreement in order for there to be an "uncured default by the Corporation."  Defendants argue that an uncured default by the Corporation, as used in paragraphs 11(a) and 11(b), requires the Employee to actually terminate the Agreement.  Moreover, defendants contend that there could be no "uncured default by the Corporation," as stated in paragraphs 11(a) and 11(b) because M&A terminated plaintiff under paragraph 7 of the Agreement effective July 1, 2009, or in any event, before the thirty-day

cure period expired.

The Court finds that whether or not plaintiff actually terminated the Agreement is irrelevant to the question of whether M&A had an uncured default. Plaintiff's first Notice of alleged defaults to M&A was dated June 18, 2009 and delivered on June 24, 2009.[27] Plaintiff's second Notice, alleging additional defaults, was sent on July 17, 2009. It is undisputed that M&A terminated plaintiff by July 23, 2009 at the latest, although the parties do dispute whether plaintiff was terminated for cause under paragraph 7, or without cause pursuant to paragraph 8.[28] Therefore, even construing the evidence in the light most favorable to plaintiff, the Agreement was terminated by M&A under either paragraph 7 or 8 before the thirty-day period during which M&A was allowed under paragraph 6 to cure the alleged defaults had expired. Therefore, the Agreement was terminated by M&A, not by plaintiff. The Court agrees with defendants that this undisputed material fact resolves the issue of the enforceability of the restrictive covenants.

While paragraph 11(a) and 11(b) do not explicitly require plaintiff to terminate the Agreement in order for there to be uncured defaults, the Court agrees that a reasonable and common-sense interpretation of the contract is that there can be no uncured default by the Corporation once the Agreement has otherwise been terminated. To be sure, paragraph 11(a) states that it shall apply "regardless of the reason, if any, for termination of the Term." Reading this in conjunction with the last line of the paragraph, the Court finds the only reasonable interpretation is that the restrictive covenant applies after the Agreement expires or is terminated,

---

[27]*See* Doc. 29, Ex. 1 ¶ 6 ("a default by the Corporation which is not cured within thirty (30) days following the delivery by the Employee to the Corporation of notice specifying such default."); Doc. 34, Ex. 2 ¶ 12 (attesting that he sent the letter on June 24 and received a certification that it was received on June 26).

[28]Complaint ¶ 12.

unless there is an <u>uncured</u> default by the Corporation.  The Court finds that, assuming M&A did

default as defined in paragraph 6, there is no genuine issue of material fact about whether there

was an uncured default at the time the Term expired.  As defined in paragraph 6, an uncured

default occurs if the Corporation does not cure the default within thirty days of the delivery of

notice.  M&A terminated the Agreement on July 23, 2009, at the latest.  Therefore, termination

occurred within thirty days of the delivery of Notice by plaintiff on June 24, triggering the

restrictive covenants in Paragraph 11.

Plaintiff suggests that defendants' interpretation should be rejected on fairness or policy

grounds because it allows M&A to nullify its default by "committing a new breach."  Plaintiff

contends that M&A admits that it did not terminate plaintiff for cause, but instead, because he

would not execute a separation agreement on terms demanded by M&A.  The terms and

existence of any proposed separation agreement were not presented by either party in their

summary judgment motions.  But plaintiff does state in the Complaint that "On April 17, 2009

M&A and Elwany told Stouder that they were cancelling his Employment Agreement.  Elwany

told Stouder that he would not terminate Stouder after he signed the cancellation agreement."

The Complaint further alleges that Stouder declined to sign the cancellation agreement.

The Court does not find defendants' interpretation of the contract to be unreasonable.

The plain language of the contract does not provide that the restrictive covenants are void if

there is any default by the Corporation, only if there is an uncured default.  Without ruling on the

issue of whether M&A defaulted or not, there is no genuine issue of material fact that it did not

commit an uncured default at the time the contract was terminated.  The fact that the parties

discussed a cancellation of the contract actually suggests that <u>plaintiff</u> was attempting to

terminate the Agreement by establishing an uncured default when he sent his Notices on June 24 and July 17, an attempt to "nullify" M&A's termination.

Under defendants' interpretation of the Agreement, there are three ways to terminate: (1) M&A terminates for cause, meaning Stouder has engaged in some wrongdoing pursuant to paragraph 7, so he is subject to termination and the restrictive covenants; (2) plaintiff terminates the Agreement pursuant to paragraph 6 because M&A did not cure its default(s) and M&A loses plaintiff as an Employee and loses any restrictive covenants that would have applied to him under the Agreement; and (3) M&A terminates plaintiff without cause, and is required to pay him twice his base salary for the next two years—$300,000. The Court agrees that this is a reasonable interpretation of the Agreement given the plain meaning of its terms, reading the contract as a whole. Accordingly, the Court grants defendants' motion for summary judgment on plaintiff's claim for declaratory relief; namely, the restrictive covenants in Article 11 are not enforceable. Plaintiff's motion for summary judgment is denied.

## V.     Injunctive Relief

Defendants renewed their motion for a preliminary injunction, enjoining plaintiff from violating the restrictive covenants in the Agreement. The Court has considered the evidence presented at the February 24 and April 5 hearings and is prepared to grant defendants' motion.

"As a preliminary injunction is an extraordinary remedy, the right to relief must be clear and unequivocal."[29] The moving party must establish the following elements to obtain relief: (1) a substantial likelihood of success on the merits; (2) a showing of irreparable injury unless the injunction issues; (3) proof that the threatened injury to the movant outweighs whatever damage

---

[29]*Schrier v. Univ. of Col.*, 427 F.3d 1253, 1258 (10th Cir. 2005) (quoting *SCFC ILC, Inc. v. Visa USA, Inc.*, 936 F.2d 1096, 1098 (10th Cir. 1991)).

the proposed injunction may cause the opposing party; and (4) a showing that the injunction, if issued, would not be adverse to the public interest.[30]  In cases where the movant has prevailed on the other factors, the Tenth Circuit uses a liberal standard for "probability of success on the merits," so the moving party need only raise "questions going to the merits so serious, substantial, difficult and doubtful as to make them a fair ground for litigation and thus for more deliberate investigation."[31]

Here, the Court has already found actual likelihood of success on the merits, as it has granted defendants' motion for summary judgment on this issue.[32]  Therefore, defendants only must establish the remaining elements in order to obtain relief.  The Court previously denied defendants' motion for TRO on the basis that they could not show irreparable harm, and therefore, the balance of harms tipped in favor of plaintiff.  However, the Court found that the public interest factor weighed in favor of defendants.

Irreparable harm may be shown to exist where money damages are inadequate to compensate the wrong or where there are difficulties in the calculation of losses.[33]  "'Loss of customers, loss of goodwill, and threats to a business' viability can constitute irreparable harm.'"[34]  Purely speculative harm does not amount to irreparable harm.[35]  The "irreparable harm

[30]*E.g.*, *id.*

[31]*Lundgrin v. Claytor*, 619 F.2d 61, 63 (10th Cir.1980) (internal quotations omitted).

[32]The factors required to obtain a permanent injunction are the same as those required to obtain a preliminary injunction with the exception that a permanent injunction requires proof of actual success on the merits. *Prairie Band Potawatomi Nation v. Wagnon*, 476 F.3d 818 (10th Cir. 2007).

[33]*Flying Cross Check, L.L.C. v. Cent. Hockey League, Inc.,* 153 F. Supp. 2d 1253, 1259 (D. Kan. 2001).

[34]*Id.* (quoting *Zurn Constructors, Inc. v. B.F. Goodrich Co.*, 685 F. Supp. 1172, 1181 (D. Kan. 1988)).

[35]*Greater Yellowstone Coal. v. Flowers*, 321 F.3d 1250, 1259 (10th Cir. 2003).

requirement is met if a plaintiff demonstrates a significant risk that he or she will experience harm that cannot be compensated after the fact by monetary damages."[36]

On the issue of irreparable harm, plaintiff presented evidence at the TRO hearing that M&A did not intend to continue to compete in the high performance computing market. M&A submitted no evidence to the contrary. Specifically, Stouder testified that M&A intended to sell TeamHPC and withdraw from the high performance computing market. Stouder also testified that the customer base for these products is research facilities and universities that purchase the products through an open bid process. Stouder testified that, as a salesman of these products, he could not carry the customers with him elsewhere and that he was not the only point of contact for all of the products sold through TeamHPC. Stouder testified about a meeting with Elwany on June 15 when Elwany offered to sell TeamHPC to Stouder and expressed his desire for Stouder to locate a buyer for TeamHPC. Stouder submitted a tape recording from this meeting that substantiates his testimony.

The Court finds that defendants came forward with sufficient evidence at the preliminary injunction hearings to respond to this evidence and to establish irreparable harm. Despite the Court's warning in its Order denying the motion for TRO, plaintiff accepted a job with one of TeamHPC's competitors.[37] Plaintiff testified that he has accepted a job with Seneca Data Systems, based in Syracuse, New York, which is in the high performance computing business.

---

[36]*Id.* (quotation omitted).

[37]"The Court notes that its ruling on this motion should in no way operate as an endorsement of Stouder's admitted-to activities since his termination. If Stouder continues to contact M&A's customers and competitors, he must assume the risk that the Court may ultimately find in favor of M&A on summary judgment, or alternatively, that a jury ultimately finds in favor of M&A on its breach of contract counterclaim."

He began his employment with Seneca on January 6, 2010; he sells high performance computers and his role there is to expand Seneca's role in that market. He admitted that he has worked with customers he had previously worked with at M&A and that he bid on a project that M&A had also bid on since beginning at Seneca.

Donna Shepard testified that TeamHPC is still a division of M&A and continues to participate in the supercomputing market. She testified that this is a niche market and that there are a limited number of companies with the expertise to compete in the market. She testified that TeamHPC has a website and participated in the trade show, "SC 09," which both Shepard and Stouder testified is essential to compete in the high performance computing market. Shepard testified that TeamHPC exhibited a cluster computer at the trade show, as well as a 3-way "SLI." Shepard testified that TeamHPC has obtained multiple purchase orders since the TRO hearing. Shepard testified that plaintiff had built relationships with clients over the years that he could carry with him to Seneca and that these relationships influence the process. She further testified that plaintiff had developed relationships with vendors and that he was aware of M&A's margin when it prepared quotes. The Court finds that defendants have shown a significant risk of harm that cannot be compensated after the fact by monetary damages. They have convincingly established that the risk of irreparable harm to M&A substantially outweighs any risk to Stouder of enforcing the restrictive covenants. Stouder was paid a premium so that he would agree to the restrictive covenants in his employment contract. He gambled that the Court would find them unenforceable and lost. The Court grants defendants' motion for preliminary injunctive relief and will favorably entertain a motion for a permanent injunction.

**IT IS THEREFORE ORDERED BY THE COURT** that plaintiff's Motion for Partial

Summary Judgment for Declaratory Relief (Doc. 8) is **denied** and defendants' Cross-Motion for Summary Judgment (Doc. 25) is **granted**. Defendants' Motion for Preliminary Injunction (Doc. 38) is **granted**. Plaintiff is hereby restrained from violating the restrictive covenants found in Article 11 of the Employment Agreement.

The Court finds defendants' Motion to Take Judicial Notice (Doc. 58) is **moot**.

**IT IS SO ORDERED.**

Dated: <u>May 24, 2010</u>

                                      <u>S/ Julie A. Robinson</u>
                                      JULIE A. ROBINSON
                                      UNITED STATES DISTRICT JUDGE