## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

|  |  |  |
|---|---|---|
| **BRET STOUDER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 09-4113-JAR-KGS** |
| | ) | |
| **M&A TECHNOLOGY, INC. and** | ) | |
| **MAGDY ELWANY,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

## MEMORANDUM AND ORDER

Plaintiff Bret Stouder filed this action against his former employer for breach of his employment contract, and for unpaid wages under the Fair Labor Standards Act and Kansas Wage Payment Act ("KWPA"). Defendants M&A Technology, Inc. ("M&A") and Magdy Elwany assert counterclaims for a declaratory judgment that Stouder was terminated for cause under the terms of his Employment Agreement, for breach of his duty of loyalty to M&A, and for tortious interference with M&A's business expectations. The Court previously granted summary judgment in favor of Defendants on one of Plaintiff's breach of contract claims, finding that the noncompetition clause in the Employment Agreement was enforceable and finding no genuine issue of material fact that Plaintiff breached the noncompetition agreement.

Before the Court is Defendants' Motion for Summary Judgment (Doc. 166) on Plaintiff's breach of contract claim that he was terminated without cause and on his KWPA claims. Defendants also seek summary judgment on their counterclaims for declaratory relief and for breach of the duty of loyalty. Because the Court determines that there is a genuine issue of material fact as to whether Plaintiff was terminated under the Employment Agreement upon the

occurrence of a default, summary judgment is denied with respect to Plaintiff's breach of contract claim and KWPA claims for unpaid wages under paragraph 8 of the Agreement and is also denied on Defendants' breach of the duty of loyalty claim.  Summary judgment is denied on Plaintiff's KWPA claim for unpaid commissions under paragraph 10 of the Agreement because there is a genuine issue of material fact as to whether Stouder is owed these commissions.

## I.       Summary Judgment Standard

Summary judgment is appropriate if the moving party demonstrates that there is "no genuine issue as to any material fact" and that it is "entitled to a judgment as a matter of law."[1] In applying this standard, the court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party.[2]  "There is no genuine issue of material fact unless the evidence, construed in the light most favorable to the nonmoving party, is such that a reasonable jury could return a verdict for the nonmoving party."[3]  A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim."[4]  An issue of fact is "genuine" if "'the evidence is such that a reasonable jury could return a verdict for the non-moving party.'"[5]

The moving party initially must show the absence of a genuine issue of material fact and

_____

[1]Fed. R. Civ. P. 56(a).

[2]*City of Harriman v. Bell*, 590 F.3d 1176, 1181 (10th Cir. 2010).

[3]*Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004).

[4]*Wright ex rel. Trust Co. of Kan. v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001) (citing *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998)).

[5]*Thomas v. Metro. Life Ins. Co.*, 631 F.3d 1153, 1160 (10th Cir. 2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

entitlement to judgment as a matter of law.[6]  In attempting to meet this standard, a movant that does not bear the ultimate burden of persuasion at trial need not negate the other party's claim; rather, the movant need simply point out to the court a lack of evidence for the other party on an essential element of that party's claim.[7]

Once the movant has met this initial burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial."[8]  The nonmoving party may not simply rest upon its pleadings to satisfy its burden.[9]  Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant."[10]  To accomplish this, the facts "must be identified by reference to an affidavit, a deposition transcript, or a specific exhibit incorporated therein."[11]

Rule 56(c)(4) provides that opposing affidavits must be made on personal knowledge and shall set forth such facts as would be admissible in evidence.[12]  Fed. R. Evid. 602 requires that a

---

[6]*Spaulding v. United Trasp. Union*, 279 F.3d 901, 904 (10th Cir. 2002) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)).

[7]*Adams v. Am. Guar. & Liab. Ins. Co.*, 233 F.3d 1242, 1246 (10th Cir. 2000) (citing *Adler*, 144 F.3d at 671); *see also Kannady v. City of Kiowa*, 590 F.3d 1161, 1169 (10th Cir. 2010).

[8]*Anderson*, 477 U.S. at 256; *Celotex*, 477 U.S. at 324; *Spaulding*, 279 F.3d at 904 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986)).

[9]*Anderson*, 477 U.S. at 256; *accord Eck v. Parke, Davis & Co.*, 256 F.3d 1013, 1017 (10th Cir. 2001).

[10]*Mitchell v. City of Moore, Okla.*, 218 F.3d 1190, 1197–98 (10th Cir. 2000) (quoting *Adler*, 144 F.3d at 671); *see Kannady*, 590 F.3d at 1169.

[11]*Adams*, 233 F.3d at 1246.

[12]Fed. R. Civ. P. 56(c)(4).

testifying witness "ha[ve] personal knowledge of the matter" testified to.[13]  "Under the personal knowledge standard, an affidavit is inadmissible if 'the witness could not have actually perceived or observed that which he testifies to.'"[14]  Statements of "mere belief in an affidavit must be disregarded."[15]  The non-moving party cannot avoid summary judgment by repeating conclusory opinions, allegations unsupported by specific facts, or speculation.[16]  In responding to a motion for summary judgment, "a party cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial."[17]  Conclusory allegations without specific supporting facts do not have probative value.[18]

When examining the underlying facts of the case, the Court is cognizant that it may not make credibility determinations or weigh the evidence.[19]  Summary judgment is not a "disfavored procedural shortcut"; on the contrary, it is an important procedure "designed to secure the just, speedy and inexpensive determination of every action."[20]

## I.     Uncontroverted Facts

The following material facts are either stipulated to, uncontroverted, or construed in the light most favorable to Plaintiff as the nonmoving party.  The Court disregards facts presented by

---

[13]Fed. R. Evid. 602.

[14]*Argo v. Blue Cross Blue Shield*, 452 F.3d 1193, 1200 (10th Cir. 2006).

[15]*Id.* (quoting *Tavery v. United States*, 32 F.3d 1423, 1427 n.4 (10th Cir. 1994)).

[16]Fed. R. Civ. P. 56(c)(4); *Argo*, 452 F.3d at 1199 (citation omitted).

[17]*Conaway v. Smith,* 853 F.2d 789, 794 (10th Cir. 1988).

[18]*Fitzgerald v. Corr. Corp. of Am.*, 403 F.3d 1134, 1143 (10th Cir. 2005).

[19]*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

[20]*Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).

the parties in the form of legal conclusions or argument, facts based solely on conclusory opinions, and facts that are only material to the credibility of witnesses.

Defendant M&A Technology, Inc. ("M&A") is a Texas corporation that maintained an office in Kansas and is authorized to do business in the State of Kansas.  Defendant Magdy Elwany is the owner, President, and Chief Executive Officer of M&A and resides in Texas.  He founded M&A in 1984.  M&A provides custom-built personal computers, servers, and networking hardware to education, government, and corporate customers.  M&A delivers installation fulfillment, project management, maintenance, help desk, and professional services.

### *The Employment Agreement*

On March 23, 2005, the parties entered into an Employment Agreement ("Agreement").  Stouder and his attorney, Daniel Owen, initially drafted the Agreement and Elwany negotiated on behalf of M&A.  Elwany and his attorney requested certain changes be made to the Agreement before it was signed by both parties.  Paragraph 1 provides for Plaintiff's duties; he was to oversee and direct the high performance computing staff and Linux activity at M&A and "serve as its Vice President/General Manager of Open Source and High Performance Computing division known as TeamHPC."  TeamHPC is a subsidiary of M&A that focuses on delivering high-performance Beowulf-class computing clusters, consisting of multiple computers built from commodity-off-the-shelf (COTS) hardware linked together in a single system operating on Linux software.  Stouder worked for M&A in its Shawnee, Kansas office in Johnson County, Kansas.[21]

Plaintiff's salary was comprised of an annual base salary, a 10% commission on revenue generated directly by him, and "[a]n additional commission . . . for his consent to the

---

[21]Plaintiff's attempt to controvert this fact is unavailing, as it is a stipulated fact in the Pretrial Order.

noncompete covenant provided in Section 11.  The additional commission will equal 5% of the gross margin from sales of Mr. Foster, Mr. Allison, and other salespersons in the TeamHPC division who report to [plaintiff] and are approved by [M&A]."

Paragraphs 6 and 7 of the Agreement provide for termination: paragraph 6 is entitled "Termination by Employee" and paragraph 7 is entitled "Termination by Corporation." Paragraph 7 provides:

> Prior to the expiration of the Term, the Corporation shall have the right to terminate this Agreement only upon the occurrence of a default by the Employee.  A default by the Employee means any one of the following:
> (a)     a material failure of the Employee to perform or comply with the Employee's duties and obligations hereunder or failure to comply with an order or direction from the Corporation which is not cured within thirty (30) days following the delivery by the Corporation to the Employee of notice specifying such default;
> (b)     the Employee commits an act of business misconduct which would permit Employee to be discharged for cause;
> (c)     the Employee commits an act of dishonesty in connection with the Employee's employment hereunder;
> (d)     the Employee's activities or conduct are disruptive to the operations of the Corporation, or threaten the security, safety, welfare, privacy or legitimate business interests of the customers of the Corporation;
> (e)     the Employee violates the confidentiality or non-competition provisions of Section [sic] hereof; . . .

The Agreement provides in paragraph 8 that if M&A terminates the Agreement "without just cause," it must compensate plaintiff for a period of two years at an annual rate of $150,000.

### Plaintiff's Performance with TeamHPC

Before joining M&A, Plaintiff worked for Atipa Technologies, Inc.  He left Atipa under unpleasant circumstances, and they became involved in contentious litigation.  The key trade show for the high performance computing space is the annual Super Computing trade show.  On

or around November 11, 2006 through November 17, 2006, Stouder attended this trade show on behalf of M&A and TeamHPC. Without the knowledge or consent of M&A or any of his superiors, Stouder used his own funds to pay for the production of twenty pairs of women's thong underwear with the word "Atipa" written in red on the front. At the trade show conference site, Stouder placed ten pairs of this underwear in the men's restroom. Stouder considered this a joke because he was already involved in litigation with Atipa and because Stouder claimed to have knowledge that the president of Atipa had attended a nude bar. Stouder also viewed the joke as a way to increase foot traffic to the TeamHPC booth at the conference.

After the conference, Atipa and Dana Chang, one of the principals of Atipa, filed a lawsuit against M&A and Stouder, alleging claims associated with Stouder's conduct at the 2006 conference. The lawsuit cost M&A substantial amounts of money and time defending itself against Stouder's conduct. However, M&A's counsel in that matter assured Plaintiff's counsel in that matter that Stouder would not suffer any adverse consequences for submitting an affidavit in support of M&A's motion for summary judgment against Atipa. M&A's counsel further assured Plaintiff's counsel that the facts set forth in that affidavit would not be a basis for his dismissal.[22]

Stouder missed his sales goals for 2007 and 2008 and had poor sales numbers in 2009 before his termination. Stouder blames any shortfalls on M&A's products, and mistakes and delays in converting purchase orders by M&A management. During the five-year period of time that Stouder worked at TeamHPC, TeamHPC earned a net profit of $1,470,253.

---

[22]Defendants object to the admission of this statement by M&A's counsel through Ms. Henry's affidavit as inadmissible hearsay. But this statement is by a party opponent, so it is not hearsay. *See* Fed. R. Evid. 801(d)(2)(A) (explaining that a statement by a party opponent can be made either in an individual or representative capacity).

*The China Lake Order*

TeamHPC's customers were obtained by submitting bids in response to open bidding opportunities advertised on various websites. If chosen by the customer, TeamHPC would be awarded the purchase order for the hardware. The purchase orders would be made out to TeamHPC, a division of M&A. After an order was received, TeamHPC personnel would enter the order into the M&A Enterprise Resource Planning ("ERP") System, as required by M&A. M&A Management would then review the order, confirm the compatibility of the componentry, and convert it into an assembly order, which would then trigger the procurement process for the parts for assembly. Stouder did not have the authority to convert purchase orders into assembly orders.

In May 2009, TeamHPC secured an order from Wyle Laboratories ("Wyle") for over $1 million in supercomputers for the Naval Air Weapons Center in China Lake, California (the "China Lake" order). The Naval Air Weapons Center is a facility funded by the federal government. A separate company, Federal Edge, negotiated and procured the China Lake order on behalf of M&A. Federal Edge had a long term relationship and record of past performance at China Lake. It contacted Stouder in 2008 about partnering with Federal Edge to supply the supercomputers to China Lake. Federal Edge held the contract with Wyle, and M&A was to be the subcontractor that manufactured the supercomputers. Federal Edge is a CCR registered 8A small business, which had certain advantages in the procurement process with the federal government. When a contract is entered into for a Small Business contractor, non-CCR small business contractors cannot simply be substituted as a party to the contract.

Elwany reviewed the China Lake purchase order and immediately was concerned that it

was not commercially reasonable or beneficial to M&A because it was made payable to Federal Edge, not M&A.  Underneath Federal Edge's name, in a different font than the rest of the purchase order, was "C/O M&A Technology," making the purchase order appear to have been modified after issuance.  As presented, the purchase order did not specify or guarantee that M&A would be paid for manufacturing the order.  Because Donna Shepard, Senior Vice President of EDU Sales, Purchase and Operations of M&A, had concerns about the purchase order, she contacted Wyle.  Rebecca Snyder at Wyle told Shepard that M&A was not named anywhere on the purchase order issued by Wyle and refused to send Shepard a copy of the purchase order because M&A was not named on it.  This exchange led Shepard to believe the order was not commercially reasonable.[23]  M&A later obtained a copy of the purchase order, confirming that M&A was not listed and there was no indication M&A would be paid for its manufacturing work.

M&A was concerned that, under the terms of the purchase order, Wyle would pay Federal Edge directly, which would then pay M&A after taking a commission on the sale.  M&A viewed this as extending over $1 million worth of credit to Federal Edge, which was risky because Federal Edge did not qualify for that amount of credit.  Elwany demanded that Stouder obtain an assignment of proceeds and repeatedly expressed his concerns about the lack of an assignment to Stouder.  Stouder maintained that the addition of "C/O M&A Technology" on the purchase order sufficed to require Wyle to pay M&A directly.  Nonetheless, Rod Stolk of Federal Edge sent a proposed assignment of proceeds form to M&A and believed it had been

---

[23]Plaintiff objects that Shepherd's conversation with Snyder is inadmissible hearsay.  But Defendants do not offer this statement for the truth of the matter asserted (that the purchase order was modified), but instead, to show Shepherd's state of mind and basis for suspicion surrounding the order, so it is admissible.  Fed. R. Evid. 801.

executed.  And Federal Edge made assurances to M&A that it would be paid.  Snyder at Wyle

also assured Elwany by email that M&A would be paid directly by Wyle.

In a series of emails between Stouder and Elwany, Elwany communicated to Stouder his

discomfort with the purchase order reference to M&A in lieu of a separate assignment of

proceeds document.  Elwany also struggled with Stouder's gross profit calculations; he was

concerned that Stouder had underestimated the cost of delivery, installation, a three-year

warranty, and ongoing support for the computers.  Stouder responded with specific answers to

Elwany's questions surrounding the purchase order, but not to Elwany's satisfaction.

On June 9, 2009, Elwany contacted Stolk and told him that M&A had misquoted the

project because Stouder had failed to take into account a three-year warranty, shipping and

handling, and on-site installation.  Rather than the approximate $105,000 commission to be paid

to Federal Edge under the modified purchase order, Elwany sought to pay Federal Edge $70,000.

Despite Federal Edge's attempt to compromise, M&A did not respond and Federal Edge

cancelled the order on June 16, 2009.

As a result of the M&A contract cancellation, Federal Edge faced default on a project

that had been designated critical for national security purposes, a "DO" project that required it to

be prioritized relative to any other commercial or unrelated military project.  After Federal Edge

cancelled the contract with M&A, Stouder contacted Steve Spring, the Chief Executive Officer

of Aspen Systems, Inc. ("Aspen").  Aspen is also in the high performance computing business.

Stouder was concerned about the project given its DO status and wanted to help Federal Edge

find a new supplier.  Stouder told Spring that he had a large million dollar deal with a good

margin that his company could not fulfill.  Stouder offered it to Spring in exchange for

10

compensation, but did not identify Federal Edge.  When Spring talked to his sales staff about Stouder's offer, they were familiar with the job because Federal Edge had already contacted them.  Nonetheless, Spring agreed to pay Stouder 15% of the gross profits on the project for the lead.  Spring viewed the commission as "insurance" to prevent Stouder from taking the order to another manufacturer.

Aspen was selected as the replacement manufacturer on the China Lake project and began manufacturing on July 2, 2009.   The purchase order between Aspen and Federal Edge went through multiple passes before they had an assignment of purchase order that satisfied Spring, given Federal Edge's lack of credit and Wyle's high security.  Ultimately, Spring was able to negotiate an assignment of purchase order that satisfied him.  Aspen received payment from Wyle for manufacturing the China Lake order in late 2009.  Stouder received a total commission from Aspen of $58,872.44.  Elwany was not aware that Stouder had contacted Spring about the China Lake order.

### *Potential Sale of TeamHPC and Plaintiff's Termination*

Just before M&A terminated the China Lake purchase order, Stouder had a face-to-face meeting with Elwany on Monday, June 15.  Stouder has submitted a recording of that conversation that he surreptitiously recorded.  During the June 15 meeting, Elwany expressed his desire to sell TeamHPC and proposed that Stouder purchase it, or find a company that would be willing to purchase it.  Had Stouder been able to find a buyer to purchase TeamHPC, Elwany would have considered allowing him a commission on the sale.

Elwany made the decision to terminate Stouder in the summer of 2009 in consultation with Shepard, and determined that Stouder was not entitled to $300,000 under the Agreement for

11

termination without just cause.  Stouder has testified that he was terminated on July 23, 2009.

He was paid wages until July 31, 2009, and continued receiving checks for commissions earned

through November 30, 2009.  Stouder was not provided with notice and an opportunity to cure

any defaults before his termination.  Stouder made the A123 sale, which is associated with a

monthly payment that should result in a $270 monthly commission to Stouder.  Defendants have

not paid Stouder commissions on the A123 sale since August 2009.

Spring traveled to Dallas in August 2009 to meet with Elwany about potentially

purchasing TeamHPC.  He did not look at its customer list, but did sign a nondisclosure

agreement.  Spring decided against the purchase, on the basis that TeamHPC's client base and

the timing was not a good fit.  Spring did not mention the China Lake project at this meeting and

did not believe it was related to the potential purchase of TeamHPC.  Ultimately, M&A never

left the HPC market and continues to actively pursue HPC opportunities, including "open-bid"

and other opportunities.

## III.    Discussion

On May 24, 2010, this Court entered a Memorandum and Order granting M&A's motion

for summary judgment on Plaintiff's claim for a declaratory judgment that the restrictive

covenants in paragraph 11 of the Agreement are not enforceable against him.  Additionally, the

Court granted Defendants' motion for a preliminary and permanent injunction restraining

Plaintiff from violating the restrictive covenants found in paragraph 11 of the Agreement.  Now

the Court must consider Plaintiff's claim that he was terminated without cause under the

Agreement, triggering his right to payment under paragraph 8.  He also contends that he was

denied wages under the KWPA, both under paragraph 8 and for commissions under paragraph

10.  Defendants counterclaim for declaratory relief on the issue of Plaintiff's termination, arguing that he was terminated with cause under paragraph 7 of the Agreement.  Defendants also move for summary judgment on their counterclaim that Plaintiff breached his duty of loyalty to M&A.

### A.        Breach of Contract Claims Surrounding Plaintiff's Termination

Plaintiff claims that Defendants breached the Agreement by refusing to compensate him for a period of two years at an annual rate of $150,000 under paragraph 8, which applies if Stouder was terminated without cause.  Defendants seek a declaratory judgment that Plaintiff was not owed this amount because he was terminated with cause under paragraph 7.   The issue therefore on the breach of contract claim and counterclaim is whether Plaintiff was terminated with or without cause.

The elements for a breach of contract claim under Kansas law are: (1) the existence of a contract between the parties; (2) consideration; (3) the plaintiff's performance or willingness to perform in compliance with the contract; (4) defendant's breach of the contract; and (5) that plaintiff suffered damage caused by the breach.[24]   The construction of a written contract is a question of law, as is whether a contract is ambiguous.[25]  Generally, if the language in a written contract "is clear and can be carried out as written, there is no room for rules of construction.  To be ambiguous, a contract must contain provisions or language of doubtful or conflicting

---

[24]*See, e.g.*, *Britvic Soft Drinks, Ltd. v. ACSIS Techs., Inc.*, 265 F. Supp. 2d 1179, 1187 (D. Kan. 2003).  The contract states that it is governed by Kansas law.  Doc. 167, Ex. 3 ¶ 19.

[25]*See, e.g.*, *Ponds ex rel. Poole v. Hertz Corp.*, 158 P.3d 369, 372 (Kan. Ct. App. 2007).

meaning, as gleaned from a natural and reasonable interpretation of its language."[26]  The fact that the parties do not agree over the meaning of terms does not in and of itself prove that the contract is ambiguous.[27]

 "'In considering a contract which is unambiguous and whose language is not doubtful or obscure, words used therein are to be given their plain, general and common meaning, and a contract of this character is to be enforced according to its terms.'"[28]  The cardinal rule of contract interpretation is that the court must ascertain the parties' intention and give effect to that intention when legal principles so allow.[29]  Where a contract is complete and unambiguous on its face, the court must determine the intent of the parties from the four corners of the document, without regard to extrinsic or parole evidence.[30]

With these principles in mind, the Court must consider the various grounds cited by Defendants for Plaintiff's termination with cause under paragraph 7 of the Agreement. Defendants argue that Plaintiff was terminated with cause because he committed several "defaults" under the Agreement: (1) his business misconduct at the 2006 trade conference; (2) he was combative and insulting with M&A's senior management; (3) he disrupted M&A's processes by refusing to integrate TeamHPC into M&A and by submitting bids that did not

---

[26]*Gore v. Beren*, 867 P.2d 330, 336 (Kan. 1994) (quotation omitted).  A contract is construed against the drafter if the meaning is ambiguous.  *Liggat v. Emp'rs Mut. Cas. Co.*, 46 P.3d 1120, 1126 (Kan. 2002).  As in its last summary judgment order, the Court declines to construe the Agreement against Plaintiff because it finds that the contract can be carried out as written; it is not ambiguous.

[27]*Ryco Packaging Corp. v. Chapelle Int'l, Ltd.*, 926 P.2d 669, 674 (Kan. Ct. App. 1996).

[28]*Wagnon v. Slawson Exploration Co.*, 874 P.2d 659, 666 (Kan. 1994) (quoting *Barnett v. Oliver*, 672 P.2d 1228, 1238 (Kan. Ct. App. 1993)) (internal quotation omitted).

[29]*Kay-Cee Enter., Inc. v. Amoco Oil Co.*, 45 F. Supp. 2d 840, 843 (D. Kan. 1999) (citing *Hollenbeck v. Household Bank*, 829 P.2d 903, 903–06 (Kan. 1992)).

[30]*Id.* (citing *Simon v. Nat'l Farmers Org., Inc.*, 829 P.2d 884, 887–88 (Kan. 1992)).

conform to M&A's standards, slowed down the manufacturing process, and cost money; (4) he did not meet expectations and sales goals; (5) he exhibited hostile, self-aggrandizing and disruptive behavior; (6) he failed to obtain a valid and enforceable assignment of proceeds or GSA teaming agreement on the China Lake Order, causing M&A to lose the contract; and (7) after-acquired evidence reveals that Stouder aided Aspen, a competitor, and negotiated a commission from Aspen while still employed by M&A, for which M&A would have terminated him.

With respect to the trade conference, M&A argues that Stouder's conduct was an act of business misconduct that was disruptive to the operations of M&A, resulting in a multi-count lawsuit against it by Atipa.  M&A argues that because it determined that Stouder's actions were defaults under paragraph 7(b) and (d), it was justified to terminate him with cause and without notice and an opportunity to cure.  Stouder responds that M&A represented to him that the lawsuit would not lead to his dismissal, nor any adverse consequences other than a letter being placed in his personnel file.  Moreover, Plaintiff points to the fact that Defendants took no action at the time of the misconduct.

The Court finds that under the express terms of the Agreement, there is a genuine issue of material fact about whether Plaintiff's conduct at the trade conference operates as a default. First, evidence that M&A's counsel expressly represented to Stouder's counsel in the Florida litigation that his admissions in that lawsuit would not form the basis for dismissal controverts M&A's evidence that Stouder's trade show conduct was disruptive to the extent that dismissal was warranted.  Plaintiff also testified during his deposition that M&A management similarly disliked Atipa and found his prank to be funny.  A reasonable jury could conclude from this

evidence that Plaintiff's activities did not constitute an act of business misconduct under paragraph (b), nor were they disruptive to operations under paragraph (d).   Moreover, Paragraph 7 provides that "the Corporation shall have the right to terminate this Agreement only upon the occurrence of a default by the Employee."[31]  Given the temporal distance between Plaintiff's actions at the 2006 trade show and his 2009 termination, a reasonable jury could conclude that he was not terminated upon the occurrence of this misconduct, as required under the plain language of the Agreement.

Next, M&A argues that Plaintiff defaulted under paragraph 7 because he was disrespectful, combative and insulting with M&A's senior management, disruptive to M&A's processes, and because he exhibited hostile, self-aggrandizing behavior.  But Plaintiff has controverted these facts with his own affidavit and deposition testimony, stating that he did not exhibit any of this conduct.  Both sides argue that the opposing side's evidence on these issues is self-serving and conclusory and accuse the other of dishonesty.  Indeed, all of the evidence submitted on these issues is self-serving and conclusory because it deals with the credibility of witnesses—they accuse one another of dishonesty.  M&A's management attests to Stouder's misbehavior while Stouder, Furukawa, and Stolk of Federal Edge attest to Stouder's outstanding behavior and ethical character and indict Elwany as misrepresenting material facts.  Furthermore, the parties disagree about whether Stouder or M&A is responsible for delays and disruptions in fulfilling purchase orders.  The parties are well aware that the Court does not weigh the evidence or determine the credibility of witnesses on summary judgment.  Whether Defendants terminated Stouder on these grounds and whether they constitute defaults under paragraph 7 of the

---

[31]Doc. 167, Ex. 3 ¶ 7 (emphasis added).

16

Agreement, under a natural and reasonable reading of the Agreement, are questions of fact that require weighing the evidence. Accordingly, the Court finds that the veracity of these alleged defaults tied to Stouder's character and to delays in processing orders must be determined by a jury.

Defendants argue that Stouder defaulted by failing to meet expectations and sales goals set for him. Stouder concedes that he did not meet these sales goals but contends that he generated healthy profits for TeamHPC that it has not been able to achieve since he was terminated. And Furukawa corroborates Stouders's contentions that M&A's processes and products made it difficult to achieve these sales figures. Again, this is a genuine dispute that cannot be resolved on summary judgment as it requires weighing the evidence. Because there is a genuine issue of material fact about whether Stouder defaulted by not making his sales goals, it is for a factfinder to decide.

Defendants next cite Stouder's conduct in conjunction with the China Lake order as a basis for termination with cause. They point to evidence that Elwany repeatedly asked Stouder to obtain an assignment of proceeds from Federal Edge in order to ensure that M&A would be paid and that he failed to comply. They further argue that Stouder misquoted the project, requiring Elwany to adjust the quote, angering Federal Edge and resulting in the contract's cancellation.

Stouder maintains that no assignment of proceeds was necessary because Wyle had assured M&A that it would be paid directly under the purchase order because of the "C/O" reference. Stouder contends that Elwany's insistence on a separate assignment of proceeds document was unnecessary because they had received an assignment of proceeds and Stouder

understood that M&A management had accepted it.[32]  He further argues that Elwany misunderstood the nature of Federal Edge's role in the project—its CCR status meant that M&A could not be substituted for Federal Edge on the purchase order.  And Stouder contends that Elwany's conduct in attempting to short Federal Edge's commission was commercially unreasonable and led to the loss of the contract.  He maintains that Elwany misrepresented to Federal Edge that Stouder misquoted the project.

The Court finds that there is a genuine issue of material fact about whether M&A actually did receive an assignment of proceeds and whether Plaintiff's inability to obtain an executed assignment of proceeds document constitutes a default under the Agreement.  Not only is there a genuine dispute about the commercial reasonableness of both sides' conduct on the China Lake purchase order, there is a genuine issue of material fact about which provision in paragraph 7 would provide a basis for Stouder's termination with cause.  If the jury determines that Stouder defaulted due to a failure to comply with an order or direction from M&A (i.e., he failed to obtain the assignment of proceeds document as directed by Elwany), he was entitled to notice by M&A and thirty (30) days to cure under the terms of that paragraph.  But if the jury determines that Stouder defaulted under one of the other provisions in paragraph 7, no notice was required.  A reasonable jury could conclude that while Stouder defaulted under paragraph

---

[32]The blank assignment of proceeds form is not authenticated by any witness on summary judgment.  Doc. 172, Ex. 44.  To be admissible, the Court must be able to find that it is sufficiently authenticated given the "appearance, contents, substance, internal patterns, or other distinctive characteristics, taken in conjunction with the circumstances."  Fed. R. Evid. 901(b)(4); *see Law Co. v. Mohawk Constr. & Supply Co.*, 577 F.3d 1164, 1170–71 (10th Cir. 2009).  Stolk stated in his affidavit that Federal Edge forwarded an assignment of proceeds form to M&A, but he did not identify Exhibit 44 as that document.  Doc. 172, Ex. 1.  The assignment of proceeds form includes preprinted information for Federal Edge and M&A and contains signature lines for Cindra Stolk of Federal Edge.  Given the contents, along with the testimony of Stolk and Stouder that this was sent to M&A management, the Court finds that it is sufficiently authenticated.  Nonetheless, the document is not executed, so it is not probative on the issue of whether it was executed, only that it was prepared.

7(a), he did not commit an act of business misconduct under paragraph 7(b).  In that scenario, Stouder would not be subject to termination for cause because it is uncontroverted that M&A did not provide him with notice and the right to cure.  These are fact intensive inquiries that largely turn on the credibility of the witnesses and are appropriately determined by the jury.

Defendants suggest in the reply that the Court should apply a standard used in employment discrimination cases—the business judgment rule.  In such cases, it is axiomatic that the Court must look at the facts as they appear to the decision maker and should not second-guess the business judgment of the employer.[33]  This principle applies in discrimination cases because "the relevant question is whether the reason articulated by the employer was the real reason for the challenged action."[34]  While Stouder certainly claims in this case that M&A's stated reasons for terminating him are pretextual, he does not contend that he was discriminated against.  Instead, his claim sounds in contract and the Court must focus on the narrow question of whether M&A breached the Agreement by terminating him without cause and failing to compensate him accordingly.  The business judgment rule does not apply to this claim.  The parties do not contend that the Agreement cannot be construed as written.  Instead, they disagree about whether Stouder engaged in certain conduct that would be grounds for termination with cause and, if so, whether that conduct justified termination under one of the provisions in the contract that did not require notice and an opportunity to cure.  These are questions of fact that must be determined by the jury.

Finally, Defendants ask the Court to apply the after-acquired evidence doctrine and find

---

[33]*See, e.g.*, *Selenke v. Med. Imaging of Colo.*, 248 F.3d 1249, 1261 (10th Cir. 2001).

[34]*Id.*

19

that Plaintiff was properly terminated for cause because he aided a competitor and earned a

commission on the China Lake project while still employed by M&A.  Under Kansas law, the

after-acquired evidence doctrine applies to breach of employment contract cases where public

policy concerns are not at issue.[35]

> Under the doctrine, an employee is not entitled to damages for
> breach of an employment contract if public policy concerns are not
> implicated and the employer can show: (1) the employee is guilty
> of some misconduct of which the employer was unaware; (2) the
> misconduct would have justified discharge; and (3) if the employer
> had known of the misconduct, the employer would have
> discharged the employee.[36]

The parties disagree about whether Defendants have shown that Stouder engaged in misconduct

by contacting Aspen about the China Lake order and earning a commission from the information

he provided, whether such conduct would have justified discharge, and whether M&A would

have discharged him if it had been aware of his conduct.

M&A contends that Stouder's assistance to Aspen in securing the China Lake order and

accepting a commission for doing so constituted misconduct under paragraph 7 of the Agreement

and would have justified his discharge.  M&A submits Elwany's affidavit with its reply, in

which he attests that M&A would have terminated Stouder for this misconduct had it known

about it in June 2009 when it occurred.  Stouder, on the other hand, emphasizes the

conversations he had with Elwany around the same time period about selling TeamHPC either to

---

[35]*Gassman v. Evangelical Lutheran Good Samaritan Soc'y, Inc.*, 933 P.2d 743, 745–46 (Kan. 1997); *see also Walker v. Saga Commc'ns, Inc.*, 11 F. Supp. 2d 1292, 1294 (D. Kan. 1998).

[36]*Walker*, 11 F. Supp. 2d at 1294 (citations omitted).  In *McKennon v. Nashville Banner Publishing Co.*, the Supreme Court placed further limits on the after-acquired evidence doctrine when applied to claims where public policy concerns are raised by the employer's conduct.  513 U.S. 352 (1995).  The Kansas Supreme Court has made clear that in the context of a breach of contract claim that raises no public policy concerns, the after-acquired evidence doctrine serves as a complete bar to relief.  *Gassman*, 933 P.2d at 747.

Stouder or to a buyer secured by Stouder.  Stouder believed that Elwany had instructed him to sell TeamHPC and that his conduct was in furtherance of selling TeamHPC to Aspen.  While Spring's deposition testimony controverts Stouder's contention that the two transactions were related, Stouder insists that he used the project to show Spring "the sort of work that M&A routinely attracted in order to fulfill Mr. Elwany's request to sell TeamHPC."

A reasonable jury could give weight to Stouder's testimony, along with the recorded conversation between Stouder and Elwany about selling TeamHPC on June 15, 2009, which took place one day before Federal Edge cancelled the China Lake order with M&A, and find that his actions were in furtherance of a directive by Elwany.  Or a reasonable jury could believe that Stouder's conduct did not constitute a default because M&A no longer had an interest in the China Lake order.  A reasonable jury could believe Stouder that his interest in finding Federal Edge a new supplier was motivated by his military background and concern about national security given the project's DO status.  Likewise, a reasonable jury could give weight to Elwany's and Spring's testimony that the two transactions were not related.  Because genuine issues of material fact prevail as to first element of the after-acquired evidence doctrine, summary judgment is not appropriate on this ground for Plaintiff's termination with cause.

Because all of the grounds cited by Defendants as a basis for Plaintiff's termination with cause under paragraph 7 of the Agreement involve genuine factual disputes, the Court denies Defendants' motion for summary judgment on the remaining breach of contract claim and counterclaim.

### B.     Breach of the Duty of Loyalty

Under Kansas law, "[a] strict fiduciary duty is imposed on officers and directors of a

corporation to act in the best interest of the corporation and the stockholders.  The duty imposed by this position of trust requires an officer or director to work for the general interests of the corporation."[37]  To establish a claim for breach of the fiduciary duty of loyalty, Defendants must show that M&A's stockholders suffered losses from Stouder's malfeasance, misfeasance, or failure to discharge the duties imposed by his office.[38]  Because Defendants' counterclaim for breach of the duty of loyalty is based on the severity of Stouder's conduct in assisting Aspen and collecting a commission on the China Lake order, the Court denies summary judgment on that claim.  As already described, there is a genuine issue of material fact about whether providing a lead to Aspen on the China Lake order was in furtherance of directive from Elwany, whether M&A had an interest in the project, and whether Stouder's conduct constituted misfeasance given the project's DO status and Stouder's contention that Elwany unreasonably marked down Federal Edge's commission, causing Federal Edge to cancel the contract.

## C.  Wage Claims

Stouder alleges a claim against M&A and Elwany for violating the KWPA.  He claims that he has earned compensation for labor or services rendered to M&A that was unpaid and that Elwany willfully failed to pay Stouder.  Under K.S.A. § 44-315(a), an employer must pay its employee's earned wages within a certain period of time after the employee quits or is discharged.  Under § 44-315(b), an employer who "willfully fails to pay an employee wages" as required by the statute, must pay a statutory penalty.  Plaintiff asserts claims against Defendants under subsections (a) and (b) of the statute.

---

[37]*Sampson v. Hunt*, 665 P.2d 743, 754 (Kan. 1983).

[38]*Id.* at 754–55.

Defendants first argue that the wage claims fail because M&A had just cause to terminate Stouder under the Agreement, therefore it never owed Stouder the amounts described in paragraph 8 for termination without cause. Under K.S.A. § 44-316, when there is a dispute over wages due under the KWPA, the employer must pay all wages conceded to be due, "leaving to the employee all remedies he might otherwise be entitled to . . . as to any balance claimed." There is clearly a dispute over the wages referenced in paragraph 8 of the Agreement. For the reasons described in the previous section, the issue of whether Stouder was terminated with or without cause must be decided by the jury; therefore, summary judgment is not appropriate on the wage claims with respect to paragraph 8 that are triggered only if Stouder was terminated without cause. If the jury finds that Plaintiff is entitled to wages under § 44-315(a), then it will determine if Defendants knowingly failed to pay Stouder wages due, which is "generally a question of fact to be determined by the trier of fact."[39]

Next, Defendants argue that Plaintiff is unable to establish that he is entitled to commissions under the terms of paragraph 10 of the Agreement. Paragraph 10 includes the various forms of compensation to be tendered by M&A to Stouder for Stouder's duties and services. In addition to his annual salary, paragraph 10 provides for commissions:

> (b)    A commission of 10% of gross margin on revenue generated directly by the employee.
>
> (c)    An additional commission will be paid to Employee for his consent to the non-compete covenant provided in Section 11. The additional commission will equal 5% of the gross margin from sales of Mr. Foster, Mr. Allison, and other salespersons in the TeamHPC division who report to Employee and are approved by the Corporation.

---

[39] *Holder v. Kan. Steel Built, Inc.*, 582 P.2d 244, 249 (Kan. 1978).

Plaintiff maintains that he is entitled to several commission payments under paragraph 10(b) that have not been paid.[40]

Defendants argue that M&A forwarded commission payments on sales that it believed Stouder directly generated, which do not include sales made after his termination, and that Plaintiff has not met his burden of showing that he is entitled to the disputed commission payments under the Agreement.  Stouder submits commission reports for 2009 and 2010, arguing that they show certain commissions paid to Jeff DeRigne, one of the TeamHPC salespersons who reported to Stouder, that rightfully should have been paid to Stouder.  Stouder also submits his own affidavit, attesting that he "made" certain sales or that certain sales were "as a result of me" that should have produced commissions for him after his termination beyond what was paid to him through November 2009.

Under the plain terms of the Agreement, in order to find Defendants liable, the factfinder must determine that sales were "generated directly" by Stouder before he was terminated and that M&A failed to pay him a 10% commission on those sales, or that sales were made by salespersons who reported to Stouder when he worked at TeamHPC for which he is due a 5% commission.  The 10% commission provision for sales generated directly by Plaintiff does not include any further temporal limitation tied to invoice date.  Defendants argue that there is no evidence showing Stouder was not paid commissions due to him under the Agreement.  But the commission reports submitted by Plaintiff do include the dates for each invoice that generated a commission, the gross margin, and the commission paid on that margin.  These reports, when viewed in the light most favorable to Plaintiff, suggest that Plaintiff may be due certain unpaid

---

[40]The parties do not dispute that commissions constitute "wages" under the KWPA.  K.S.A. § 44-313(c).

commissions under the plain terms of the Agreement.  For example, it is undisputed that Plaintiff generated the "A123 sale," and the invoices show that he was paid commissions on invoices associated with this customer during most of 2009 at a rate of 10%.  Beginning in November 2009, M&A halted commission payments to Stouder, yet it appears that DeRigne was paid a 10% commission on this customer as late as April 2010, suggesting that the sale was continuing to generate invoices and margins for M&A for which Stouder was not paid a commission.

M&A appended notes to certain commission reports for Stouder after his termination. On the October 2009 commission report, a note reads: "Stouder terminated 7/21/09.  These are invoices that were paid after he left including the one for DeRigne."[41]  Stouder was paid his 10% commission and a 5% commission on DeRigne's sales for invoices that were dated prior to his termination.  On the November 2009 report, a note reads: "Stouder is terminated but should receive commissions for sales prior to July 21, 2009 for himself and DeRigne."  Another note on that report reads: "Cheryl, Please note invoices that commission has not been paid on due to the date of the invoice.  Also, the invoices for 7/31/09 need to be confirmed that they were processed before 7/21/09."  Viewing the evidence in the light most favorable to Plaintiff, these notes and the dates on the invoices included in these reports suggest that M&A only paid Plaintiff commissions after his termination on invoices that were processed prior to July 21, 2009, the date that M&A contends Stouder was terminated.  A reasonable jury could conclude that, under the terms of paragraph 10 of the Agreement, Stouder was instead entitled to commissions on any invoice that was from a sale "directly generated" by him regardless of the date of invoice.

With respect to the 5% commission on sales by others who "report to [Stouder] and are

---

[41]Doc. 172, Ex. 18 at 17.

approved by the Corporation."  Under the terms of the Agreement, the jury must determine that

any unpaid commissions on these sales were generated when such other salespersons reported to

Stouder.   The Court is unable to determine based on these reports the commissions for which

Plaintiff is entitled to a 5% commission.  Given the notes on the commission reports, M&A

appears to have taken the position that Stouder was only entitled to the 5% commission for

invoices dated or processed before Stouder was terminated.  But under the contract, the question

is whether the sales by DeRigne were made when DeRigne reported to Stouder, or independently

after Stouder was terminated.   Because there is a genuine issue of material fact about whether

Stouder is due unpaid commissions under a natural and reasonable reading of the Agreement,

summary judgment is not appropriate on his KWPA claims.

## IV.   Conclusion

The Court has carefully evaluated the evidence submitted by the parties on summary

judgment and concludes that genuine issues of material facts prevail.  The parties present vastly

different versions of the events that give rise to Plaintiff's claims in this case, and the Court may

not resolve those factual disputes at the summary judgment stage.  These questions require a

careful weighing of the evidence by the factfinder.  At trial, the jury will be required to

determine whether Plaintiff defaulted under paragraph 7 of the Agreement, and if so, whether

M&A appropriately terminated him with cause under that paragraph.  The jury will also be

required to determine whether Stouder breached his duty of loyalty to M&A by providing a lead

on M&A's cancelled China Lake order to Aspen, a competitor, and by collecting a commission

on that lead.  Finally, the jury will be required to determine whether Plaintiff is due wages set

forth in paragraph 8 of the Agreement and whether he is due unpaid commissions under

paragraph 10 of the Agreement.  Because the Court has denied summary judgment on

Defendants' counterclaim for breach of the duty of loyalty, it need not resolve at this juncture the

issue of whether the faithless servant doctrine applies to Plaintiff's wage claims.[42]

**IT IS THEREFORE ORDERED BY THE COURT** that Defendants' Motion for

Summary Judgment (Doc. 166) is **denied**.

**IT IS SO ORDERED.**

Dated: <u>January 5, 2012</u>

 S/ Julie A. Robinson
JULIE A. ROBINSON
UNITED STATES DISTRICT JUDGE

---

[42]*See Bessman v. Bessman*, 520 P.2d 1210, 1220 (Kan. 1974).